

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHER DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. EDWARD LEDEZMA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | No. 04 C 2379 |
| v. | ) | |
| | ) | Wayne R. Andersen |
| BLAIR LEIBACH, Warden, Danville | ) | District Judge |
| Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before the court on the petition of Edward Ledezma for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254 (1994). For the following reasons, the petition for habeas

corpus is denied.

## BACKGROUND

Petitioner Edward Ledezma does not challenge the statement of facts set forth in the order

of the Illinois Appellate Court affirming his conviction for the attempt first-degree murder of

Marco Mercado. For purposes of federal habeas review, "a determination of a factual issue made

by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e). Accordingly, we adopt the

facts as set forth in the opinion of the Illinois Appellate Court.

## I.    Statement of Facts

On December 21, 1994, Marco Mercado, Jesse Gutierrez and George Montejano were

driving through Chicago. Mercado was driving. Montejano was in the front passenger seat, and

Gutierrez was in the back seat behind Montejano. Both Mercado and Montejano were members

of the "26"street gang. At about 9:00 p.m., Mercado stopped the car near the corner of 30th and

Komensky Streets in Chicago. Approximately 15 members of the "26" gang were gathered there, and Mercado and Montejano spoke with one of the gang members, Julius Salazar.

While talking with Salazar, an unknown individual wearing a red and black jacket with a white hood emerged from the gangway and approached Mercado's car. Mercado drove the car towards the individual to ascertain his identity and gang allegiance. The unidentified individual then fired gun shots into the car. One shot hit Mercado's leg, and another shot hit Mercado in the back, paralyzing him from the chest down.

After Mercado was shot, Montejano kicked Mercado's foot off of the accelerator so that Montejano could control the accelerator while Mercado steered, and they sped away to a nearby fire station to call the paramedics. While at the fire station, Montejano spoke with Salazar, who told him that a gun battle had occurred after they drove away. According to Salazar, when the hooded individual fled, Salazar chased after him and fired numerous shots. The hooded individual also fired shots back at Salazar. Salazar saw the hooded individual enter a blue van parked in an alley, and Salazar fired several shots at the van. After telling Montejano what happened, Salazar left the fire station and did not speak to the police about this incident until he was arrested in an unrelated matter shortly before trial.

At trial, Officer Duarte testified that he arrived at the fire station and spoke with Montejano and Gutierrez. Officer Duarte testified that Montejano and Gutierrez told him that the shooter got into a blue van and fled the area. Montejano and Gutierrez described the shooter as a male Hispanic wearing a black jacket with a white hood, approximately 5'6" or 5'7" tall, 130 or 140 pounds, and between 18 and 25 years old. Officer Duarte broadcast this information over the police radio.

2

Officer Duarte was on his way back to the scene of the shooting to record the address with Montejano and Gutierrez when he received a radio message that other officers had stopped a blue van with the suspected shooter at the intersection of 30th and St. Louis Streets, which is approximately six blocks from where the shooting occurred. Montejano and Gutierrez heard the message over the radio. Officer Duarte testified at the preliminary hearing that when he arrived at 30th and St. Louis both Montejano and Gutierrez identified the van as the one they saw leaving the area of the shooting.

There were five people who were inside the van when the police pulled it over. Officer Duarte testified that both Montejano and Gutierrez identified petitioner/defendant Edward Ledezma as the shooter. At trial, Officer Duarte testified that Montejano and Gutierrez identified Ledezma as the shooter while all five individuals were placed against a wall. However, prior to trial, in his testimony at a hearing on Ledezma's motions to quash the arrest and to suppress evidence and identification testimony, Officer Duarte testified that Montejano and Gutierrez identified Ledezma when he and the other four individuals were on the ground. The trial court denied the motions to quash arrest and suppress evidence and identification testimony.

Officer Duarte explained at trial that Ledezma was first identified by Montejano when he was on the ground. The police officers then stood the five individuals up against a wall, and Ledezma was identified by both Montejano and Gutierrez. After Montejano and Gutierrez identified Ledezma, all five individuals who were in the van were arrested. Ledezma, and at least two of the individuals arrested with him, was a member of the Latin Kings street gang, which is a rival of the "26" gang.

No weapon or ammunition was found inside the blue van. No fingerprints could be recovered from the bullet casings recovered from the scene. No gunshot residue test was performed on Ledezma, nor did an evidence technician process the van. At trial, Mercado admitted that he was a member of the "26" gang. In his testimony, Montejano initially denied membership in the "26" gang. However, in rebuttal, Montejano admitted that he was a crew leader in the "26" gang.

The day after the shooting, Mercado picked out Ledezma's picture from a photo array shown to him at the hospital. At trial, Mercado identified Ledezma as the shooter. Gutierrez also identified Ledezma in court as the shooter and testified that he identified him the night of the shooting. At trial, Montejano also identified Ledezma in court and testified that, on the night of the shooting, he identified Ledezma first while he was on the ground and then also after he stood up against the wall.

After the State rested, the defense sought to call Julio Salazar as a witness. Salazar was in police custody on an unrelated charge. Shortly before trial began, Salazar was arrested by the Chicago police in an unrelated matter. An assistant State's attorney took a handwritten statement from Salazar indicating that he witnessed Mercado, the victim in this case, being shot and that he chased the shooter from the scene. During this chase, Salazar stated that he and the shooter exchanged gun fire. Salazar said that when the shooter got into a blue van, he shot at the van. Salazar said that he was not able to identify the shooter. However, Salazar described the same clothing as Montejano had described, and Salazar's description matched the description of the clothing worn by Ledezma when he was arrested.

4

When Ledezma's defense counsel indicated his intention to call Salazar as a witness, the trial court conducted a hearing outside the presence of the jury to determine the validity and parameters of any Fifth Amendment claim Salazar may have. The trial court appointed a public defender to represent Salazar and to assist in determining if Salazar had any valid Fifth Amendment concerns relating to his potential testimony in this case. After interviewing Salazar, the public defender represented to the court that he believed Salazar legitimately could invoke the Fifth Amendment as to whether he had fired shots at the shooter and the van.

At the hearing, Ledezma's attorney extensively questioned Salazar about his involvement in the shooting of Mercado and the events that transpired after the shooting. However, Salazar invoked his rights under the Fifth Amendment. After the hearing, the trial court ruled that Salazar's invocation of his Fifth Amendment rights precluded defense counsel from questioning Salazar about being armed and shooting at the van. The trial court also ruled that defense counsel could not introduce into evidence Salazar's handwritten statement that he had been armed and shot at the van.

After this ruling, defense counsel called Salazar as a witness. Salazar testified that he could not identify Ledezma as the shooter because the shooter wore a white hood over his head. Salazar further testified that he saw the shooter enter a blue van. Salazar also admitted that he was a member of the "26" gang.

Gregory Ferns and Isidro Diaz also testified at trial on Ledezma's behalf. They testified that they were with Ledezma in the blue van on the night of the shooting, but that the van never was near the scene of the shooting and that Ledezma was not involved. In addition, Diaz testified

5

that he was not a member of a gang. However, a police officer testified in the State's rebuttal case that he saw Diaz throw gang signs and yell "King Love" on September 29, 1995.

In rebuttal, the State called assistant State's attorney Mark Shlifka, who testified that he took a statement from Ledezma on December 22, 1994 in which Ledezma denied being in the area on the night of the shooting, but admitted wearing a red and black jacket with a white hood. After closing arguments, the jury found Ledezma guilty of attempt first-degree murder, and he was sentenced to a 30-year term of imprisonment.

## II. Procedural History

Ledezma appealed his conviction and sentence to the Illinois Appellate Court. In his appeal, Ledezma raised the following issues for review:

(1) the trial court erred when it refused to reconsider its pre-trial ruling or grant a new trial in light of Officer Duarte's inconsistent pre-trial and trial testimony;

(2) the trial court erred when it denied Ledezma's motion to suppress the show-up identification as unduly suggestive;

(3) the trial court denied Ledezma his right to present a defense when it precluded him from introducing evidence that Salazar made an incriminating statement; and

(4) the prosecution withheld *Brady* information about witness, Montejano.

The Illinois Appellate Court affirmed Ledezma's conviction and sentence on May 1, 1998. *See*

*People v. Ledezma*, No. 1-96-1380 (Ill. App. Ct. (1st Dist.) 1998).

Following the Appellate Court's decision, Ledezma filed a petition for leave to appeal to the Illinois Supreme Court in which he raised only two of the four issues he submitted to the Appellate Court for its review. The issues contained in his petition to the Illinois Supreme Court were that (1) the trial court erred when it refused to reconsider its pre-trial ruling or grant a new

6

trial in light of Officer Duarte's inconsistent pre-trial and trial testimony, and (2) the trial court denied Ledezma's his right to present a defense when it precluded him from introducing evidence that Salazar made an incriminating statement. On December 2, 1998, the Illinois Supreme Court denied Ledezma's petition. *See People v. Ledezma*, No. 85626 (Ill. Sup. Ct. 1998).

On February 26, 1999, Ledezma filed a petition for post-conviction relief. In that petition, Ledezma argued:

(1) trial counsel was ineffective for failing to call several witnesses who could have testified that Ledezma was at the home of his mother-in-law at the time of the shooting;

(2) trial counsel failed to interview and call an occurrence witness, Rosa Zavala, who lived across the street from where the shooting took place and who would have testified that Ledezma did not shoot Mercado;

(3) trial counsel failed to interview one unidentified person who had information about the actual identity of the person who shot Mercado;

(4) trial counsel failed to introduce Ledezma's jacket into evidence even though it was different than the jacket described by Mercado, Montejano, Gutierrez and Salazar as the jacket worn by the shooter;

(5) trial counsel was ineffective for failing to call Ledezma to testify on his own behalf; and

(6) the trial court denied Ledezma's right to present a defense insofar as the court did not permit trial counsel to ask Salazar about statements made by him about his decision to shoot at the blue van.

On June 30, 1999, Ledezma filed a supplemental petition for post-conviction relief in which he expanded his ineffective assistance of counsel arguments and included affidavits of three witnesses. The court held an evidentiary hearing on the petition and, on March 8, 2001, dismissed Ledezma's post-conviction petition. *See People v. Ledezma*, 95 CR 3131 (Ill. Cir. Ct. 2001).

Ledezma appealed the ruling of the trial court dismissing his post-conviction petition. On November 15, 2002, the Illinois Appellate Court affirmed the dismissal of Ledezma's post-conviction petition. *See People v. Ledezma*, No. 1-01-1384 (Ill. App. Ct. (1st Dist.) 2002). On December 23, 2002, Ledezma filed a petition for leave to appeal to the Illinois Supreme Court in which he included the same claims that he raised in his post-conviction appeal. On April 2, 2003, the Illinois Supreme Court denied the petition. *See People v. Ledezma*, No. 95516 (Ill. Sup. Ct. 2003).

On April 1, 2004, Ledezma filed an amended petition for a writ of habeas corpus. Ledezma has raised the following issues for review:

(1) trial counsel was ineffective for failing to call several witnesses who could have testified that Ledezma was at the home of his mother-in-law at the time of the shooting;

(2) trial counsel failed to interview and call an occurrence witness, Rosa Zavala, who lived across the street from where the shooting took place and who would have testified that Ledezma did not shoot Mercado; and

(3) trial counsel failed to call certain witnesses to testify at the hearing on Ledezma's motion to suppress the identification of him as the gunman.

## III.    State Court Evidentiary Hearing on Ledezma's Post-Conviction Petition

As stated above, the court held an evidentiary hearing on Ledezma's supplemental post-conviction petition submitted on June 30, 1999. The facts relating to the evidentiary hearing, as set forth in the opinion of the Illinois Appellate Court, are presumed true for purposes of this court's review. *See* 28 U.S.C. § 2254(e).

On February 26, 1999, Ledezma filed a post-conviction petition which alleged ineffective assistance of trial counsel. The basis of the petition asserted that trial counsel was ineffective for

8

failing to interview and call known alibi and occurrence witnesses at trial. On March 8, 1999, the trial court summarily dismissed the petition.

On June 30, 1999, Ledezma submitted a supplemental petition which attached affidavits of three witnesses – Luis Zavala, Rosa Zavala and Gavin Jones. In light of the statements contained in the affidavits, the trial court vacated its summary dismissal of Ledezma's petition and granted him leave to file his amended post-conviction petition. The trial court also set the matter for a hearing.

At the evidentiary hearing, Luis Zavala and Rosa Zavala testified consistent with their affidavits. Luis Zavala is Ledezma's brother-in-law. Rosa Zavala is Ledezma's wife's brother's former spouse. Each testified that Ledezma's trial counsel never contacted him or her. Luis Zavala testified that he saw Ledezma in front of his mother's home from 9:00 until 9:15 p.m. on the evening of the shooting. Luis Zavala further testified that he saw Ledezma attempting to park his van on the street.

At the hearing, Rosa Zavala testified that while running an errand with her sister Blanca, she observed the shooting from her car and that Ledezma was not the shooter. Blanca was inside a friend's home when the shooting occurred. In addition, Rosa Zavala testified that after she learned that Ledezma was arrested, she told her sister Violeta Silva that Ledezma was not the shooter. Rosa Zavala further testified that the first person she spoke to about the shooting, other than her sister, was Ledezma's post-conviction trial counsel. Rosa Zavala stated that she did not come forward because she feared for her family's safety.

Diana Hinojosa also testified at the hearing. Her testimony was consistent with her affidavit, which was filed after Ledezma filed his supplemental post-conviction petition.

9

Hinojosa testified that on the evening of the shooting, at approximately 9:00 or 9:15 p.m., she saw Ledezma driving a van on 28th Street. Hinojosa testified that Ledezma stopped to talk to her and then saw him park his van near his wife's family's residence. When Hinojosa drove away, at approximately 9:15 p.m., the van still was parked. Hinojosa testified that Ledezma's trial attorney never contacted her.

At the evidentiary hearing, Jesus Guzman testified that he, his brother Raphael, Ledezma, Gregory Ferns and Isidro Diaz were in Ledezma's van on the evening of the shooting. After getting beer, they drove to Ledezma's wife's parent's house at approximately 9:00 p.m. Ledezma went into the house, returned, and then they drove the van a short distance. The van stopped so Ledezma could talk to a girl. After they drove away, the police pulled them over at the corner of Trumbell and 28th Streets.

Jesus Guzman further testified that when Ledezma was identified at the scene of the stop, he was standing while the other four individuals were lying on the ground. Although Jesus Guzman testified that he told police that evening that Ledezma did not have anything to do with the shooting, Jesus Guzman admitted that November 1999 was the first time he came forward with the information that Ledezma had not been involved in the shooting.

Raphael Guzman testified to essentially the same time line of events that occurred on the night of the shooting. Raphael Guzman also testified that when the police stopped the van, the four passengers, including himself, were thrown to the ground while Ledezma was taken to the side of a nearby building. The police told Gregory Ferns to stand up, and Raphael Guzman heard witnesses say that Ferns was not the shooter. Raphael Guzman testified that he then heard the witnesses identify Ledezma as the shooter.

10

Gregory Ferns testified that he and Isidro Diaz were gang members. Ferns testified that after the police stopped them and placed them on the ground, he heard the witnesses tell police that he was not the shooter. Ferns testified that he then saw the police point towards the corner where Ledezma was standing and that the witnesses then identified Ledezma as the shooter. Ferns testified that Ledezma's trial counsel interviewed him prior to the hearing on the motion to suppress but did not ask him to testify at the hearing.

At the hearing on his supplemental post-conviction petition, Ledezma testified similarly to the Guzmans as to the time line on the evening of the shooting. Ledezma testified that after leaving his wife's family's house, he stopped and talked with Diana Hinojosa and then drove away. When he was pulled over at the intersection of Trumbell and 30th Streets, Ledezma stated that the police took him to the side of the building, put the other occupants of the van on the ground, and then saw the two witnesses point to where he was standing and identify him. Ledezma further testified that he told his trial attorney about the existence of all of the above witnesses and that, to the best of his knowledge, his counsel had not contacted them. Ledezma also testified that his trial counsel told him that, in his opinion, Ledezma should not testify and that his testimony would not make any difference.

At the post-conviction hearing, Ledezma's trial counsel, Daniel Radakovich, also testified and set forth in detail his activities regarding Ledezma's case. Radakovich became licensed as an attorney in 1974. He was a member of the Cook County Public Defender's Murder Task Force and has tried more than 150 jury trials to verdict. Radakovich represented Ledezma from the preliminary hearing through the trial. Radakovich, following several conferences with Ledezma

and his parents, interviewed Greg Ferns and Isidro Diaz. Radakovich also testified that he had hired an investigator to work on this case.

Radakovich testified that he followed up on all of the witnesses provided by Ledezma, including his mother and father, his wife, Isidro Diaz, Greg Ferns and Violeta Silva and that he had prepared notes during his interviews. Radakovich testified that during the interviews with Ferns and Diaz he learned that Ledezma was standing during the witness identification at the scene of the van stop. Radakovich also testified that he did not call Ferns to testify at the hearing on the motion to suppress, stating he wanted to save Ferns as a surprise witness at trial. Radakovich also testified that Ferns was an avowed gang member who had a gang website on the internet.

With regard to the other witnesses, Radakovich testified that Violeta Silva had told him that she heard shots that night but did not see anything. Radakovich further testified that Silva did not provide him with any information about her sister, Rosa Zavala, during the interview.

Radakovich also testified that he had asked Ledezma to try to contact Raphael and Jesus Guzman when he learned they were not affiliated with a gang. Radakovich, however, admitted that this was not reflected in any of his interview notes. Radakovich did not recall interviewing Raphael or Jesus Guzman. Radakovich further testified that Ledezma had informed him that he could not rely on the Guzmans because they were "shaky."

Radakovich acknowledged that he did not call any witnesses other than police officers at the hearing on the motion to suppress. Radakovich testified that, in his opinion, the officers' testimony assisted in the defense's case.

12

When asked whether he was told that Ledezma was at his wife's parent's home just prior to the shooting, Radakovich testified that Ledezma told him that during the shooting he was at Fern's house. Radakovich further testified that Ledezma told him he had been at his wife's parent's home earlier in the night and that he returned there just prior to the shooting, but did not stop. Radakovich also testified that in an amended answer to discovery he asserted that Ledezma did not know his exact location at the time of the offense, but stated that he was not at or near the location where the shooting occurred.

Radakovich admitted that he did not recall interviewing Ledezma's mother-in-law, Elenna Zavala, Luis Zavala or any member of the Zavala family. Radakovich further testified that in a conference with Ledezma and his father he was told about Rosa Zavala. Radakovich stated that his notes reflected that Rosa Zavala was picking up an unidentified woman who saw the shooting and that she knew of a potential witness. His notes reflected a blank line with the word "Name" with a question mark in parenthesis next to this statement. Radakovich could not recall whether he interviewed Rosa Zavala, or whether he asked his investigator to locate her.

Finally, Radakovich testified that Ledezma did not testify at trial. Radakovich stated that the decision was ultimately Ledezma's choice but that it was based upon his recommendation.

On March 8, 2001, following the conclusion of the evidentiary hearing, the trial court denied Ledezma's post-conviction petition stating:

> I have had the benefit of examining all the trial transcripts and motion transcripts, all of my notes which I preserved, and I recall this case very very well. I recall the performance of Defense Counsel as well as the State in the trial of this cause. And I observed the witnesses and considered their testimony. I had the benefit of arguments of very able Counsel . . . . I have observed Defense Counsel, trial Defense Counsel, testify as a witness in the hearing that I allowed. I recall the nature and extent and the manner in which

he conducted the defense of this defendant. I have considered the test enunciated in *Strickland versus Washington* and the points and authorities . . . indicated [by the parties].

It is upon the totality of each and every one of these considerations that I reflected upon very carefully. And accordingly, I am going to deny the application for post-conviction relief. I feel that Counsel's performance did not fall below an objective standard of reasonableness. I feel that much of what he did in fact he did based on his experience and performance in this court as trial counsel as well as a witness demonstrating he proceeded in the manner which he did based on his experience, and that amounted to tactics that he felt would be appropriate in this particular case.

*People v. Ledezma*, No. 95 CR 3131 (March 8, 2001).

## LEGAL STANDARD

Federal courts may issue a writ of habeas corpus only if a petitioner demonstrates that he is "in [state] custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2000); *see Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1370 (7th Cir. 1994) (en banc) ("Federal courts can grant habeas relief only when there is a violation of federal statutory or constitutional law."). Habeas relief under section 2254 may be granted if a state court's judgment either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See Williams v. Taylor*, 529 U.S. 362, 386 (2000); *Boss v. Pierce*, 263 F.3d 734, 738 (7th Cir. 2001). In addition, section 2254 allows for habeas relief only if the state court decision lies "well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002).

14

Before a federal court may review the merits of a habeas petition, a petitioner must (1) exhaust all remedies available in the state courts and (2) fairly present any claims in state court first or risk procedural default. *See Chambers v. McCaughtry*, 264 F.3d 732, 737 (7th Cir. 2001) ("Failure to exhaust available state court remedies constitutes a procedural default."). A petitioner must exhaust his state court remedies "by either (a) providing the highest court in the state a fair opportunity to consider the constitutional issue, or (b) having no further available means for pursuing a review of one's conviction in state court." *Wallace v. Duckworth*, 778 F.2d 1215, 1219 (7th Cir. 1995).

Here, exhaustion is not an issue. Ledezma has exhausted his state court remedies for purposes of federal habeas review because he has no further avenues in state court through which to challenge his conviction. Thus, we turn to the merits of this petition and will address each of the claims in turn.

## ANALYSIS

Each of Ledezma's claims are based on allegations of ineffective assistance of counsel. Ineffective assistance claims are governed by the familiar standards of *Strickland v. Washington*, 466 U.S. 668 (1984). Ledezma must demonstrate that his trial counsel's performance was deficient, meaning it fell below objective standards for reasonably effective representation. *Id.* at 687- 688. The court reviews counsel's performance deferentially, particularly counsel's choice of strategies. *See Drake v. Clark*, 14 F.3d 351, 355-57 (7th Cir. 1994).

A habeas petitioner bears a heavy burden in demonstrating that counsel's performance was deficient to the point of offending the Constitution. *See id.; see also Brown v. Sternes*, 304 F.3d 677, 683-686 (7th Cir. 2002) (granting habeas relief due to ineffectiveness assistance of

counsel). *Strickland* also requires a showing of prejudice in which the petitioner must show that, but for his counsel's deficient performance, there is a reasonable probability that the result of the proceedings would have been different. 466 U.S. at 694. A reasonable probability of a different result will be found if the court's confidence in the outcome is undermined by evidence of deficient attorney performance. *See Brown,* 304 F.3d at 683; *Morris v. United States,* 264 F.3d 726, 727 (7th Cir. 2001).

**I.      Trial Counsel Was Not Ineffective for Failing to Call Certain Alibi Witnesses**

Ledezma first asserts that his trial counsel was ineffective for failing to call several alibi witnesses to testify at trial, including Elenna Zavala, Luis Zavala, Diane Hinojosa, Raphael Guzman and Jesus Guzman. Ledezma argues that these witnesses would have bolstered his alibi defense. The Illinois Appellate Court rejected this claim and held that decisions involving which witnesses to call to testify are matters of trial strategy left to counsel's discretion. *See People v. Ledezma,* No. 01-1384, at 18-20.

It is clear from the record before us that the Illinois Appellate Court properly identified and applied *Strickland* as the legal standard governing Ledezma's claim. Thus, unless we find that the Illinois Appellate Court "unreasonably applied the *Strickland* standard to the facts of this case, we are without authority to grant [Ledezma's] petition for habeas relief." *Murrell v. Frank,* 332 F.3d 1102, 1111 (7th Cir. 2003), quoting in part, *Bell v. Cone,* 535 U.S. 685, 694 (2002) (internal quotations omitted). "[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. " *United States v. Williams,* 106 F.3d 1362, 1367 (7th Cir. 1997). Under *Strickland,* courts should not second-guess counsel with the benefit of

16

hindsight and can require only "a professionally competent defense, not . . . the best possible defense." *Holman v. Gilmore,* 126 F.3d 876, 883 (7th Cir. 1997).

According to the evidence presented at the post-conviction evidentiary hearing, Radakovich explained that his trial strategy was to present an alibi defense. Radakovich testified that during pre-trial discussions Ledezma told him that he was at Ferns' house when the shooting occurred. Radakovich further testified that Ledezma told him that he had been at his wife's parent's home earlier in the night and that he returned there just prior to the shooting but did not stop. Radakovich then testified that in an amended answer to discovery he asserted that Ledezma did not know his exact location at the time of the shooting, but stated that he was not at or near 3031 South Komensky where the shooting occurred. Thus, relying on information provided to him by his client, Radakovich called Ferns and Diaz to testify at trial.

A defense attorney's performance is acceptable when he chooses a professionally competent strategy that secured for the accused the benefit of an adversarial process. *Kokoraleis v. Gilmore,* 131 F.3d 692, 696 (7th Cir. 1997). If the attorney's strategic decisions were sound when they were made, these decisions cannot support a claim of ineffective assistance of counsel. *United States v. Kozinski,* 16 F.3d 795, 813 (7th Cir. 1994). Specifically, a decision not to call a witness to testify can be a strategic decision. *Id.*

As the Illinois Appellate Court recognized, Radakovich prepared his defense based on information provided to him by Ledezma himself. Ledezma's alibi defense was confirmed by the testimony provided by Ferns and Diaz. As explained above, Ledezma told Radakovich that he had been at his wife's parent's home earlier in the night and that he returned there just prior to

17

the shooting, but did not stop. As such, Radakovich's decision not to interview or call Elenna Zavala or Luis Zavala as witnesses was more than reasonable because, according to Ledezma himself, he was not at the home of his mother-in-law when the shooting occurred. Moreover, the Illinois Appellate Court also recognized that the corroborative value and credibility of the testimony of these witnesses would be decreased in the eyes of the jury because of their obvious bias. *See People v. Ledezma*, No. 01-1384, at 20.

We also agree with the Illinois Appellate Court's conclusion that Radakovich was not ineffective for failing to call Diana Hinojosa to testify at trial. *Id.* at 21. Ledezma claims that Hinojosa's testimony would establish that he stopped the van near his mother-in-law's house and spoke with her around 9:15 p.m. However, there is no evidence in the record that Radakovich was aware of Hinojosa prior to trial, and Hinojosa did not come forward with this information until March 1996. For these reasons, we agree with the Illinois Appellate Court's conclusions and do not find anything objectively unreasonable with its analysis. Accordingly, Ledezma's request for habeas relief on this claim is denied.

## II.     Trial Counsel Was Not Ineffective for Failing to Call Rosa Zavala as an Occurrence Witness

In his second claim, Ledezma argues that his trial counsel was ineffective for failing to interview Rosa Zavala and to call her as an occurrence witness at trial. Ledezma claims that Rosa Zavala would have testified that she witnessed the shooting and that Ledezma was not the shooter. The Illinois Appellate Court rejected this argument under *Strickland*'s performance prong, finding that there was nothing in the record that Radakovich had any information that

18

Rosa Zavala had anything of substance to contribute or that she was an eye witness to the shooting. *See People v. Ledezma*, 01-1384, at 22.

At the evidentiary hearing, Radakovich testified consistent with his notes that he was told that Rosa Zavala knew of a potential unidentified witness to the shooting. In an interview with Violeta Silva, Rosa's sister, Radakovich's notes showed that Violeta stated that she heard shots but did not see anything. Violeta Silva also did not provide Radakovich with any information about her sister during the interview.

Based on this record, the Illinois Appellate Court's application of *Strickland*'s performance prong was not unreasonable. At the time of Radakovich's investigation, Rosa Zavala did not come forward as a witness to the shooting. In addition, as the Illinois Appellate Court again pointed out, Rosa Zavala also had credibility problems in light of the fact that she did not come forward with her testimony until years after the trial in addition to the fact that she formerly was related to Ledezma. In light of these facts, Ledezma has not satisfied his burden of persuasion, and his petition for relief on this claim is denied.

Finally, the Illinois Appellate Court alternatively concluded that even if it were to assume arguendo that Radakovich's failure to call any, or all, of these witnesses at trial was not a matter of trial strategy and was objectively unreasonable, Ledezma still had not established any prejudice as required under *Strickland*. We agree. As the Illinois Appellate Court recognized, Ledezma was identified as the shooter by three eye witnesses at trial. He was pulled over and arrested minutes after and only blocks away from the shooting in a van described by the witnesses at the scene and was wearing clothes matching the description of the shooter by

witnesses. Based on the evidence, it was more than reasonable for the Illinois Appellate Court to conclude that there was no reasonable probability that the result of the proceedings would have been any different.

### III. Petitioner's Claim That Trial Counsel Was Ineffective for Failing to Call Certain Witnesses to Testify at the Hearing on the Motion to Suppress Is Procedurally Defaulted

Finally, Ledezma's third claim in his habeas petition is that his counsel was ineffective because he failed to call witnesses Greg Ferns, Isidro Diaz, Jesus Guzman and Raphael Guzman to testify at the hearing on the motion to suppress the identification of Ledezma as the shooter. Ledezma did not raise this claim in his post-conviction petition, but did argue this issue in his post-conviction appeal. The Illinois Appellate Court concluded that this claim was waived because it was not raised in Ledezma's original or amended petition for post-conviction relief. *See People v. Ledezma*, No. 01-1384, at 13; *see also* 725 ILCS 5/122-3.

As stated above, section 2254 requires a habeas petitioner to exhaust the remedies available in state court prior to pursuing federal habeas relief. *See* 28 U.S.C. § 2254(b)(1)(A). In addition to exhausting the remedies available in state court, a petitioner is procedurally barred from raising claims in his federal habeas petition that were not raised in the state court proceeding. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding that a petitioner's failure to present three claims to the Illinois Supreme Court for discretionary review resulted in procedural default of those claims).

Federal courts cannot review any claim that the state court has disposed of on state law grounds. *See Fisher v. Cowan*, 2004 WL 178185, at * 3 (N.D. Ill. Jan. 14, 2004). In Illinois, it is

20

well-settled that any claim not raised in the post-conviction petition is waived. *See People v. McNeal*, 194 Ill.2d 135, 153, 742 N.E.2d 269 (2000) ("A post-conviction petitioner may not wait until appeal to formulate the matters that he wished to assert as grounds for post-conviction relief."). The Seventh Circuit has confirmed that a federal court should enforce a state court's finding of default. *See Reese v. Peters*, 926 F.2d 668, 671 (7th Cir. 1991).

Put another way, a federal court is not permitted to reach the merits of a habeas claim "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Thus, this court cannot review a question raised by a habeas petitioner if he has failed to present a claim at the time, or in the manner or forum, as required by Illinois state law, so long as the state court's decision rests on "independent and adequate" state law grounds. *Id.* at 729. The Illinois Appellate Court's finding of waiver in this instance constitutes an "independent and adequate" state procedural disposition to which this court must defer. *See id; Fisher*, 2004 WL 178185, at * 3.

To avoid procedural default, a petitioner must show "cause for the default and actual prejudice as a result of the alleged violation of federal law," or that the failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. In this case, Ledezma has not made any showing of cause and prejudice for his default or that a miscarriage of justice occurred. Therefore, his third claim is procedurally defaulted.

## CONCLUSION

For all of the foregoing reasons, the petition for a writ of habeas corpus is denied.

Wayne R. Andersen
United States District Judge

Dated: August 24, 2005